[Cite as *Lamar Advantage GP Co., L.L.C. v. Cincinnati*, 2020-Ohio-3377.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| LAMAR ADVANTAGE GP COMPANY, LLC, d.b.a. LAMAR ADVERTISING OF CINCINNATI, OH, | : | APPEAL NO. C-180675 TRIAL NO. A-1804105 |
| and | : | *O P I N I O N.* |
| NORTON OUTDOOR ADVERTISING, INC., | : | |
| Plaintiffs-Appellees, | : | |
| vs. | : | |
| CITY OF CINCINNATI, OHIO, | : | |
| NICOLE LEE, TREASURER OF THE CITY OF CINCINNATI, OHIO, | : | |
| ART DAHLBERG, DIRECTOR OF THE DEPARTMENT OF BUILDINGS AND INSPECTIONS FOR THE CITY OF CINCINNATI, OHIO, | : | |
| and | : | |
| REGINALD ZENO, FINANCE DIRECTOR FOR THE CITY OF CINCINNATI, OHIO, | : | |
| Defendants-Appellants. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: June 18, 2020

*Strauss Troy Co., LPA, R. Guy Taft* and *Stephen E. Schilling,* for Plaintiff-Appellee Lamar Advantage GP Company, LLC, d.b.a. Lamar Advertising of Cincinnati, OH,

*Robbins, Kelly, Patterson & Tucker, LPA, Michael A. Galasso* and *Esther M. Norton,* for Plaintiff-Appellee Norton Outdoor Advertising, Inc.,

*Paula Boggs Muething,* City Solicitor, *Marion E. Haynes, III,* and *Kevin M. Tidd,* Assistant City Solicitors, for Defendants-Appellants.

**WINKLER, Judge.**

{¶1}   This appeal addresses the constitutionality of an excise tax placed on off-premises outdoor advertising signs, or billboards, within the city of Cincinnati. Two advertising companies, plaintiffs-appellees Lamar Advantage GP Company, LLC, d.b.a. Lamar Advertising of Cincinnati, OH, ("Lamar") and Norton Outdoor Advertising, Inc., ("Norton") filed suit against defendants-appellants the city of Cincinnati, Ohio, Nicole Lee, treasurer of the city of Cincinnati, Art Dahlberg, director of the department of buildings and inspections for the city of Cincinnati, and Reginald Zeno, finance director for the city of Cincinnati (collectively "the city"). Lamar and Norton challenged the constitutionality of the billboard tax and sought to preclude the city from enforcing the tax.

{¶2}   The trial court held that the city's excise tax on billboards was unconstitutional and violated the First Amendment to the United States Constitution, and the trial court granted a permanent injunction barring the city from enforcing the tax.  The city appeals the trial court's decision.  For the reasons that follow, we affirm that portion of the trial court's decision holding that the city's prohibition on communications between outdoor advertising hosts and their customers regarding the tax is unconstitutional.  We reverse the remainder of the trial court's decision holding the excise tax unconstitutional, and we remand for further proceedings.

### Factual Background and Procedural Posture

{¶3}   In June 2018, Cincinnati City Council enacted Ordinance No. 167-2018, which created an excise tax on billboards.  The ordinance is embodied in Chapter 313 of the Cincinnati Municipal Code ("CMC").  The billboard tax provides

3

that an "advertising host," who owns or controls an outdoor advertising sign in the city, must pay a tax that is the greater of either (1) seven percent of the gross receipts generated by any sign, or (2) an annual minimum tax calculated based upon the type, location, and square footage of the sign.  CMC 313-3.

{¶4}    In addition to imposing an excise tax, the ordinance also prohibits an advertising host from issuing a statement to an advertiser in which the tax is reflected.  CMC 313-7(a).  The ordinance also prohibits a host from indicating that an advertiser will absorb the cost of the tax.  CMC 313-7(b).

{¶5}    Soon after the passage of the billboard tax, Lamar and Norton filed separate complaints against the city challenging the constitutionality of CMC Chapter 313.  In addition to challenging the billboard tax, Lamar and Norton also challenged another city ordinance, Ordinance 163, which raised the cost of permit fees for the construction and renewal of billboards ("the permit-fee ordinance").  The city has since repealed the permit-fee ordinance; however, the companies seek damages related to the permit fees.  Lamar's and Norton's actions were consolidated by the trial court.

{¶6}    In their complaints, Lamar and Norton alleged that CMC Chapter 313 was unconstitutional under the First Amendment, the Equal-Protection Clause, and the Commerce Clause.  Lamar and Norton also alleged that the city's actions constituted an unlawful taking of their private property for which an appropriation proceeding should issue, as well as claims under 42 U.S.C. 1983 and 42 U.S.C. 1988.  Lamar and Norton requested damages, including a refund of any taxes, fees, and assessments collected by the city, and also requested declaratory and injunctive relief.

{¶7} Norton and Lamar filed motions for preliminary injunctions seeking to enjoin the city from enforcing CMC Chapter 313. The trial court held a lengthy evidentiary hearing over several days on the requests for a preliminary injunction. At the conclusion of the injunction hearing, the trial court entered an order requesting objections as to whether a permanent injunction should issue. The trial court ultimately granted in part Lamar's and Norton's motions for a preliminary injunction, and entered an order declaring the billboard tax unconstitutional under the First Amendment. The trial court then entered an order sua sponte consolidating the preliminary-injunction hearing with the issue of whether a permanent injunction should issue in accordance with Civ.R. 65. The city objected to any finding by the trial court as to whether CMC Chapter 313 was unconstitutional, but it did not object generally to the consolidation of the litigation.

{¶8} The trial court later entered a lengthy decision explaining its reasoning that CMC Chapter 313 violated the First Amendment. The trial court entered an order granting in part Lamar's and Norton's requests for a permanent injunction and enjoined the city from enforcing CMC Chapter 313. The trial court included Civ.R. 54(B) language, finding that there was "no just reason for delay." It is from the issuance of the permanent injunction that the city now appeals.

**Jurisdiction**

{¶9} After the parties filed their merit briefs, this court ordered the parties to file supplemental briefing on the issue of whether this court had jurisdiction over the city's appeal.

{¶10} Appellate court jurisdiction is limited to the review of final orders. *See* Ohio Constitution, Article IV, Section 3(B)(2). An order is final and appealable only

5

if it meets the requirements of R.C. 2505.02 and Civ.R. 54(B), if applicable. *Chef Italiano Corp. v. Kent State Univ.*, 44 Ohio St.3d 86, 88, 541 N.E.2d 64 (1989).

{¶11} R.C. 2505.02 defines final orders. In relevant part, R.C. 2505.02(B) provides "[a]n order is a final order that may be reviewed, affirmed, modified, or reversed, with or without retrial, when it is one of the following: * * * (2) An order that affects a substantial right made in a special proceeding or upon a summary application in an action after judgment[.]" A substantial right is "a right that the United States Constitution, the Ohio Constitution, a statute, the common law, or a rule of procedure entitles a person to enforce or protect." *See* R.C. 2505.02(A)(1). R.C. 2505.02(A)(2) defines "special proceeding" as "an action or proceeding that is specially created by statute and that prior to 1853 was not denoted as an action at law or a suit in equity."

{¶12} Here, the trial court declared the city's excise tax unconstitutional and permanently enjoined the city from further collection of the tax. An order that declares a legislative enactment unconstitutional affects a substantial right of the government. *Riverside v. State*, 190 Ohio App.3d 765, 2010-Ohio-5868, 944 N.E.2d 281 (10th Dist.). The trial court's determination that CMC Chapter 313 was unconstitutional and could not be enforced affected a substantial right of the city.

{¶13} As to whether an order has been entered in a special proceeding, the character of the order on appeal is not determinative. *Walters v. Enrichment Ctr. of Wishing Well, Inc.*, 78 Ohio St.3d 118, 676 N.E.2d 890 (1997). Instead, courts must examine the character of the underlying action to determine whether a special proceeding exists. *Id.* Although the order from which the city appeals enters a permanent injunction, the character of the underlying proceeding brought by Norton and Lamar ultimately sought a declaration that CMC Chapter 313 was

6

unconstitutional. An action seeking a declaratory judgment is a "special proceeding." *Riverside* at ¶ 12; *Whitley v. Progressive Cas. Ins. Co.*, 1st Dist. Hamilton No. C-110157, 2012-Ohio-329, ¶ 7. Thus, the trial court's injunction order was made in a special proceeding. Because the trial court's order affected the city's substantial rights, and it was made in a special proceeding, the order is final under R.C. 2505.02(B)(2).

{¶14} Even if an order is final under R.C. 2505.02, the order is only appealable if it satisfies Civ.R. 54(B), if applicable. *Chef Italiano Corp.*, 44 Ohio St.3d 86, 541 N.E.2d 64. Civ.R. 54(B) allows a court to enter "final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay." When a trial court makes the determination under Civ.R. 54(B) that an interlocutory appeal "is consistent with the interests of sound judicial administration" and that "no just reason for delay exists," the trial judge has made a factual determination, which is entitled to deference. *Wisintainer v. Elcen Power Strut Co.*, 67 Ohio St.3d 352, 617 N.E.2d 1136 (1993), paragraphs one and two of the syllabus. Use of Civ.R. 54(B) language in an order, however, is not a "mystical incantation which transforms a nonfinal order into a final appealable order." *Id.* at 354.

{¶15} At the time the trial court entered its permanent injunction and declared CMC Chapter 313 unconstitutional, Lamar and Norton had multiple claims either still pending or that the trial court had failed to specifically dismiss. Norton and Lamar requested monetary damages and attorney's fees as part of their claims alleging that the billboard tax violated the First Amendment. In their supplemental briefs, the parties correctly assert that any damages and attorney's fees recoverable by Norton and Lamar would arise as separate claims against the city under 42 U.S.C.

1983 and 42 U.S.C. 1998. Therefore, the claims for monetary relief are sufficiently separate, and the trial court's Civ.R. 54(B) certification is entitled to deference.

{¶16} Norton and Lamar also alleged several claims challenging the constitutionality of the city's billboard tax, and the trial court never addressed the other grounds, despite the apparent trial of those claims at the injunction hearing.

{¶17} Appellate courts have held that where a trial court enters a judgment in favor of a plaintiff on fewer than all of the alternate grounds argued by the plaintiff, this " 'does not strip the trial court's judgment of finality.' " *Cleveland v. State*, 8th Dist. Cuyahoga No. 106688, 2019-Ohio-315, ¶ 16, quoting *Riverside*, 190 Ohio App.3d 765, 2010-Ohio-5868, 944 N.E.2d 281, at ¶ 12. This is because a judgment that has the effect of rendering other claims moot is final and appealable without regard to Civ.R. 54(B). *Wise v. Gursky*, 66 Ohio St.2d 241, 421 N.E.2d 150 (1981). In both *Cleveland* and *Riverside*, the courts determined that Civ.R. 54(B) did not apply when a trial court held a statute unconstitutional on one of multiple grounds raised. *See Cleveland* at ¶ 16; *Riverside*, 190 Ohio App.3d 765, 2010-Ohio-5868, 944 N.E.2d 281, at ¶ 15.

{¶18} The trial court's decision to hold the billboard tax unconstitutional under the First Amendment had the effect of rendering moot Norton's and Lamar's other claims challenging the constitutionality of the billboard tax. Civ.R. 54(B) does not apply to Norton's and Lamar's other claims regarding the constitutionality of the billboard tax because those claims are no longer pending. Even if Civ.R. 54(B) applied, however, the trial court's entry included a Civ.R. 54(B) certification, which is entitled to deference.

{¶19} Finally, even though the city repealed the permit-fee ordinance, Norton and Lamar have surviving claims related to the permit fees that the city had

8

collected from them pursuant to that ordinance. As to these remaining claims, the trial court's Civ.R. 54(B) certification that the legal and factual issues related to the billboard tax are separate from the issues surrounding the permit-fee ordinance is a factual determination that is entitled to deference. *See Wisintainer*, 67 Ohio St.3d 352, 617 N.E.2d 1136, at syllabus.

{¶20} Therefore, we hold that the city has appealed from a final, appealable order, and this court has jurisdiction over the city's appeal.

### Standard of Review

{¶21} In this case, the order from which the city appeals grants a permanent injunction in favor of Lamar and Norton. Ordinarily, this court reviews the grant of a permanent injunction for abuse of discretion. *P&G Co. v. Stoneham*, 140 Ohio App.3d 260, 268, 280, 747 N.E.2d 268 (1st Dist.2000). Even though the trial court entered a permanent injunction, in doing so, the trial court declared the entirety of CMC Chapter 313 unconstitutional under the First Amendment and prohibited the city from enforcing the ordinance in all circumstances. As pointed out by the city, a duly-enacted municipal ordinance is entitled to a presumption of constitutionality with the burden placed on a challenger of the ordinance. *Arnold v. Cleveland*, 67 Ohio St.3d 35, 38, 616 N.E.2d 163 (1993). The constitutionality of a legislative enactment is a question of law, which is reviewed de novo. *Crutchfield Corp. v. Testa*, 151 Ohio St.3d 278, 2016-Ohio-7760, 88 N.E.3d 900, ¶ 16.

### Billboards, Taxes, and the First Amendment

{¶22} In its first assignment of error, the city argues that the trial court erred in holding that the billboard tax violated the First Amendment.

{¶23} The First Amendment to the United States Constitution guarantees the freedom of speech. The notion that billboards are a means of "speech" entitled to

First Amendment protection is not disputed. The United States Supreme Court first recognized the First Amendment protection given to billboards in *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). In *Metromedia*, the billboard owners challenged a San Diego ordinance that prohibited outdoor advertising signs. The ordinance created an exception to the general prohibition on outdoor advertising displays for those depicting religious symbols, government signs, and political-campaign signs. The Court recognized the use of billboards as a means to communicate a wide array of messages, and thus deserving of First Amendment protection. The Court held that the ordinance violated the First Amendment, although a majority could not agree on the reasoning. A plurality held that the ordinance violated the First Amendment because the ordinance made content-based distinctions among types of noncommercial speech. Two other justices concurred and reasoned that the ordinance was content neutral, but that San Diego had failed to provide an adequate reason for a total ban.

{¶24} The United States Supreme Court has also recognized that the government's taxation of the media can implicate the First Amendment. The first of these cases was *Grosjean v. Am. Press Co., Inc.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936). In *Grosjean*, Louisiana had imposed a license tax of two percent of the gross receipts from the sale of advertising on all newspapers with a weekly circulation above 20,000. Only 13 of the 124 publishers in the state were subject to the tax. In holding that the tax violated the First Amendment, the Court reasoned that the tax appeared to be a calculated means to limit the flow of information.

{¶25} Next, the Supreme Court considered a use tax on ink and paper products consumed by publishers in *Minneapolis Star and Tribune Co. v. Minnesota Commr. of Revenue*, 400 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1984). In

10

*Minneapolis Star*, the state of Minnesota had enacted a use tax on the cost of paper and ink products consumed in the production of a publication. The tax created an exemption for the first $100,000 worth of ink and paper consumed by a publication in a calendar year. After application of the $100,000 exemption, only 14 of 388 of the paid-circulation newspapers were required to pay the tax the first year the tax was imposed. One of those newspapers challenged the tax on First Amendment grounds.

{¶26} The Supreme Court invalidated Minnesota's use tax on publications for two reasons: (1) the Minnesota tax singled out the press for differential treatment, and (2) the tax targeted a small group of newspapers. As to the first ground, the Court reasoned that singling out the press for differential treatment threatened to censor critical speech. The Court reasoned that "differential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional." *Id.* at 585.

{¶27} As to the second ground for invalidating Minnesota's tax, the Court reasoned that the taxing of only those publications consuming over $100,000 in ink and paper targeted a small group of newspapers. The Court reasoned that "when the exemption selects such a narrowly defined group to bear the full burden of the tax, the tax begins to resemble more a penalty for a few of the largest newspapers than an attempt to favor struggling smaller enterprises." *Id.* at 591. The Court continued that "a power in the State not only to single out the press but also to tailor the tax so that it singles out a few members of the press presents such a potential for abuse that no interest suggested by Minnesota can justify the scheme." *Id.* at 591-592.

{¶28} The Court applied strict scrutiny to Minnesota's tax, meaning that the tax could not stand unless Minnesota could show that the burden placed on the First Amendment was necessary to achieve an overriding state interest. The Court held that Minnesota's interest in raising revenue did not justify the burden placed on the First Amendment.

{¶29} Following *Minneapolis Star*, the United States Supreme Court again considered whether a tax violated the First Amendment in *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987). In *Arkansas Writers' Project*, the Court considered whether the Arkansas gross receipts tax, which contained an exemption for religious, professional, trade, and sports magazines, violated the First Amendment. Even though the tax applied generally to the sales of all tangible personal property, the Court determined that the differential tax treatment among magazines "suffers from the second type of discrimination identified in *Minneapolis Star*." *Id.* at 229. Because a magazine's tax status depended entirely on its content, the Court applied strict scrutiny, which required Arkansas to show that differential taxation of magazines was necessary to serve a compelling interest, and that the tax scheme was narrowly drawn to achieve that interest. Finding that none of the state's alleged interests sufficed, the Court held that the Arkansas tax violated the First Amendment.

{¶30} Finally, in *Leathers v. Medlock*, 499 U.S. 439, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991), the United States Supreme Court considered the constitutionality of a generally applicable Arkansas sales tax, which exempted certain media segments. The Arkansas Gross Receipts Act imposed a four percent tax on the sale of all tangible personal property, and the tax contained an exemption for newspaper sales and magazine-subscription sales. A cable-television subscriber and

provider argued that the sales tax violated the First Amendment by treating television differently.

{¶31} The *Leathers* Court recognized that cable television is a means of speech, but that the Arkansas tax treating cable-television providers differently than other media did not present the same concerns as *Minneapolis Star* and *Arkansas Writers' Project*. The Arkansas tax applied generally to the sale of all tangible personal property and did not single out the press for special treatment. Moreover, the Arkansas tax did not target a small group of cable providers. The tax applied to approximately 100 suppliers of cable television, and the record established that cable television provided a wide variety of messaging—including news and entertainment. Thus, the Court held that the First Amendment was not violated.

### Applying United States Supreme Court Cases to the Billboard Tax

{¶32} The trial court in this case relied on *Grosjean*, *Minneapolis Star*, *Arkansas Writers' Project*, and *Leathers* in holding that the billboard tax violated the First Amendment. The trial court reasoned that these cases stood for the proposition that the government could not "single out and direct or target a tax solely at the exercise of First Amendment rights or at the means or instruments utilized in exercising First Amendment rights nor may the government impose a tax that targets a small narrow group to bear the burden of the tax." The trial court distinguished *Leathers*, the main case relied upon by the city, by reasoning that the sales tax at issue in *Leathers* applied generally to the sale of all tangible personal property, unlike the city's billboard tax. The trial court applied the strict-scrutiny analysis used in *Minneapolis Star*, which required the city to show a compelling governmental interest that the city could not have achieved without the discriminatory tax. *Minneapolis Star*, 460 U.S. at 585, 103 S.Ct. 136, 575 L.Ed.2d

295. The trial court determined that the city had not met its burden to show that it could not have achieved its interest in raising revenue without the billboard tax.

{¶33} The city contends that the trial court erred in applying strict scrutiny to the billboard tax. The city relies on a recent case from Maryland in which the court considered whether a similar billboard tax violated the First Amendment, *Clear Channel Outdoor, Inc. v. Dir., Dept. of Fin. of Baltimore City*, 244 Md.App. 304, 316, 223 A.3d 1050 (Md.App.2020). Just like the city in this case, Maryland created an excise tax applicable only to billboard operators. Once implemented, the majority of the tax burden fell upon plaintiff Clear Channel, even though three other groups also had to pay the tax. Clear Channel challenged the tax under the First Amendment.

{¶34} The *Clear Channel* court examined the relevant United States Supreme Court decisions in *Metromedia*, *Minneapolis Star*, and *Leathers*. The court reasoned that after *Leathers*, a tax would trigger First Amendment concerns as follows:

> when it threatens to suppress the expression of particular ideas or viewpoints. Absent a compelling justification, the government may not exercise its taxing power to single out the press. The press plays a unique role as a check on government abuse, and a tax limited to the press raises concerns about censorship of critical information and opinion. A tax is also suspect if it targets a small group of speakers. Again, the fear is censorship of particular ideas or viewpoints. Finally, for reasons that are obvious, a tax will trigger heightened scrutiny under the First Amendment if it discriminates on the basis of the content of taxpayer speech.

14

*Clear Channel* at 321, quoting *Leathers*, 499 U.S. at 447, 111 S.Ct. 1438, 113 L.Ed.2d 494.

{¶35} The court reasoned that Maryland's billboard tax was content neutral in that the tax applied whenever an advertising host charged a fee to a third party, regardless of the advertiser's message. Maryland's tax did not threaten the expression of any particular speech. The court also rejected Clear Channel's argument that the tax targeted a small group of speakers. The court reasoned that the tax applied to all billboard owners and operators, and it did not single out any particular group of billboard operators.

{¶36} We consider the analysis in *Clear Channel* persuasive here. The city's billboard tax applies to billboards regardless of the message displayed, and is therefore content neutral. Nothing in the language of the tax itself or the record suggests that the tax will threaten to suppress the expression of certain viewpoints. Moreover, the billboard tax does not single out a particular group of billboard operators to bear the burden of the tax.

{¶37} The trial court determined that the billboard tax wrongfully targets a small, narrow group of the media. The reason that a small group of billboard operators exists is because of a decades-old "cap and replace" program instituted by the city. The "cap and replace" program essentially means that a billboard operator must surrender an existing billboard in order to construct a new billboard. As a result of the city's market restrictions on billboards, the supply of billboards has held steady over time. Norton and Lamar have an oligopoly on the market of billboard licenses in Cincinnati with an approximate total of 415 signs and 450 signs respectively. Thus, market forces and other government restrictions on billboards

15

created a small group of billboard operators to bear the burden of the tax. The tax itself did not single out a small group for taxation.

{¶38} Furthermore, differential taxation of the media is not constitutionally suspect if "justified by some special characteristic of the press." *Minneapolis Star*, 460 U.S. at 585, 103 S.Ct. 1365, 75 L.Ed.2d 295. Billboard operators are different from more traditional press mediums like news organizations. Billboard operators themselves seldom display their own content, and news organizations generally publish their own content or viewpoints.

{¶39} As discussed in *Leathers*, differential taxation of the press "is constitutionally suspect when it threatens to suppress the expression of particular ideas or viewpoints." *Leathers*, 499 U.S. at 447, 111 S.Ct. 1438, 113 L.Ed.2d. 494. In this case, the billboard tax does not pose a danger of suppression of ideas. The billboard tax applies regardless of the message conveyed, and the evidence presented at the injunction hearing shows that the billboard operators display a myriad of messages from various corporate, nonprofit, and government agencies. Therefore, the billboard tax does not implicate First Amendment concerns.

{¶40} We determine that the billboard tax does not infringe on the First Amendment. As a result, we sustain the city's first assignment of error.

### The "Not to be Separately Stated or Charged" Provision

{¶41} In the city's second assignment of error, it argues that the trial court erred in separately enjoining CMC 313-7, entitled "Tax Not to be Separately Stated or Charged." CMC 313-7 limits communications between advertising hosts, like Lamar and Norton, and their customers.

{¶42} CMC 313-7 provides:

16

(a) The tax shall not be stated or charged separately from the rent or other consideration paid by an advertiser for use or occupancy of an outdoor advertising sign or shown separately on any record thereof, or otherwise reflected upon any bill, statement, or charge made for the sign's use or occupancy issued or delivered by the advertising host.

(b) No advertising host shall state in any manner, whether directly or indirectly, that the tax or any part thereof will be assumed or absorbed by an advertiser, or that it will be added to the rent or other charge.

(c) Nothing in this section prohibits an advertising host from doing the following:

    i.  including in the rent or price it charges an advertiser an amount sufficient to recover the tax imposed by this chapter;

    ii.  including an amount sufficient to recover the tax imposed by this chapter on a billing or invoice pursuant to the terms of a written license or lease agreement providing for the recovery of the advertising host's tax costs; or

    iii.  otherwise recovering an amount sufficient to recover the tax imposed by this chapter on a billing or invoice pursuant to the terms of a written agreement executed prior to the effective date of this chapter.

{¶43} In urging us to reverse the trial court's decision, the city argues that the trial court failed to exercise judicial restraint in reaching the constitutionality of

CMC 313-7. The city argues that it did not have notice that the trial court would decide the constitutionality of this provision. The record belies the city's notice argument. During closing arguments at the injunction hearing, all parties argued the constitutionality of CMC 313-7. The trial court and counsel discussed the possible severability of provisions of CMC Chapter 313. Therefore, the city had sufficient notice that the constitutionality of CMC 313-7 would be separately considered by the trial court.

{¶44} The city also argues that the trial court overstated the breadth of speech that CMC 313-7 prohibits. The trial court determined that CMC 313-7 was a content-based restriction on noncommercial speech, and therefore must be subject to strict scrutiny, meaning that the city must show that CMC 313-7 is necessary to serve a compelling interest by the city, and that CMC 313-7 is narrowly drawn to achieve that end. *See Boos v. Barry*, 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (applying strict scrutiny to content-based regulations of political speech). The trial court reasoned that CMC 313-7 restricted noncommercial, political speech, because the provision was a calculated means for public officials to avoid accountability for the billboard tax and the inevitable increased advertising costs of billboards.

{¶45} The trial court's determination that CMC 313-7 prohibits political speech is not supported by the evidence at the hearing and contradicts the plain language of the ordinance. No evidence of political motive for CMC 313-7 was offered at the hearing. The plain language of CMC 313-7 only regulates the billboard operator's speech vis-à-vis an advertiser for the billboard space. Speech that "relate[s] solely to the economic interests of the speaker and its audience," or speech that "propos[es] a commercial transaction" is commercial speech. *Central Hudson*

18

*Gas & Elec. Corp. v. Pub. Serv. Comm.*, 447 U.S. 557, 561-562, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). "The Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Id.* at 562-563.

{¶46} In *Central Hudson*, the United States Supreme Court developed a level of intermediate scrutiny to be applied to commercial speech:

> it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* at 566.

{¶47} The Sixth Circuit applied the *Central Hudson* test to a similarly-worded Kentucky tax in *BellSouth Telecommunications, Inc. v. Farris*, 542 F.3d 499 (6th Cir.2008). The Kentucky statute imposed a tax on telecommunications services. Part of the Kentucky tax prohibited telecommunications providers from separately stating the tax on the bill to consumers. Kentucky's justification for the "no-stating-the-tax" provision was to avoid consumer confusion over who bore the responsibility of the tax—the providers.

{¶48} The *BellSouth* court held that the "no-stating-the-tax" provision violated the *Central Hudson* standard. The court reasoned that the telecommunications providers would not be engaging in unlawful or misleading speech by telling consumers that they were raising prices as the result of a new tax. The court assumed for the sake of argument that Kentucky's justification for the

19

provision was substantial, but the court reasoned that the provision as worded did not directly advance the government's interest. The court reasoned that the no-stating-the-tax provision allowed providers to tell consumers anything they wanted about the tax except in an invoice.

{¶49} As to the third prong of the *Central Hudson* test, the "reasonable-fit" prong, the court theorized multiple ways Kentucky could avoid consumer confusion that would not restrict speech, including enforcement of existing federal-consumer-protection laws, or the requirement of a disclaimer stating that the tax must be borne by the providers. *BellSouth* at 508. Therefore, the court held that the no-stating-the-tax provision violated the First Amendment.

{¶50} The city argues that the *Central Hudson* test applicable to commercial speech is inapplicable here because CMC 313-7 is aimed at prohibiting misleading speech by advertising hosts regarding the tax. The United States Supreme Court has held that "inherently misleading" speech made in the course of a commercial transaction may be prohibited by the government. *In re R. M. J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982). The city's argument that any communications between advertising hosts and their customers regarding the billboard tax is somehow inherently misleading is unpersuasive.

{¶51} Applying *Central Hudson* to CMC 313-7, we assume that the city has a substantial interest in ensuring that the billboard tax operates as an excise tax and not a sales tax. The same governmental interest was at issue in *BellSouth*. However, just as in *BellSouth*, CMC 313-7 is broader than necessary to achieve the city's interest. CMC 313-7 prohibits billboard operators from issuing a bill, statement, or charge to an advertiser in which the tax is reflected. CMC 313-7(a). CMC 313-7 even prohibits "indirect" statements by billboard operators that the tax will be absorbed

by the advertisers. CMC 313-7(b). However, CMC 313-7 permits billboard operators to increase rent to recover the cost of the tax. CMC 313-7(c). It is not clear how billboard operators could justifiably raise their customers' advertising costs without informing them of the billboard tax. Just as in *BellSouth*, a simple disclaimer to the customers would clear up any would-be confusion that the billboard tax remains the operators' responsibility to pay.

{¶52} Therefore, we determine that CMC 313-7 is broader than necessary to achieve the city's interest in ensuring that the billboard tax remains an excise tax and not a sales tax, and, therefore, CMC 313-7 fails the *Central Hudson* test. *See Central Hudson*, 447 U.S. at 566, 100 S.Ct. 2343, 65 L.Ed.2d 341. We overrule the city's second assignment of error.

### Conclusion

{¶53} We affirm that portion of the trial court's decision holding CMC 313-7 unconstitutional under the First Amendment. The remainder of the trial court's decision holding the entirety of CMC Chapter 313 unconstitutional is reversed. We remand the case to the trial court for further proceedings consistent with this opinion and the law.

Judgment affirmed in part, reversed in part, and cause remanded.

**MYERS, P.J.,** and **BERGERON, J.,** concur.

Please note:
 The court has recorded its own entry this date.